NO. 07-01-0467-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

DECEMBER 31, 2002

_____

UNITED ENTERPRISES, INC. AND BILL HIELSCHER, APPELLANTS

V.

ERICK RACING ENTERPRISES, INC. AND JACK ERICK, APPELLEES

_____

FROM THE 181ST DISTRICT COURT OF RANDALL COUNTY;

NO. 40,723-B; HONORABLE JOHN T. FORBIS, JUDGE

_____

Before QUINN and JOHNSON, JJ., and BOYD, SJ.[1]

Appellants United Enterprises, Inc. (United) and Bill Hielscher (Hielscher) appeal from a judgment in favor of appellees Jack Erick (Erick) and Erick Racing Enterprises, Inc. (Erick Racing) in appellees' suit for damages resulting from fraud in connection with the sale to them of the Amarillo Dragway in January 1993. Appellants counterclaimed for

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 2002).

breach of a note executed in connection with the sale, a written guaranty, and the contract of sale. In their issues, appellants challenge (1) the trial court's rescission of the contract documents and award of restitution or reliance damages, (2) the legal and factual sufficiency of the evidence to support the findings of fraud, and (3) a take-nothing judgment with respect to their breach of contract counterclaims. As cross-appellants, appellees contend the trial court erred in (1) entering a take-nothing summary judgment with respect to their Deceptive Trade Practices Act (DTPA) and breach of contract claims, (2) excluding evidence of appellants' agent instructing that Erick should not be told about material facts prior to his purchase of the race track, (3) not granting a judgment notwithstanding the verdict as to the amount of damages sustained by appellees which were established as a matter of law, and (4) not granting a judgment notwithstanding the verdict as to the amount of attorney's fees on appeal to be awarded to appellees.

Hielscher was owner of the real estate and business known as the Amarillo Dragway. United operated the racetrack and held interests in some other properties. Because of health problems in 1991, Hielscher decided to sell the Amarillo Dragway. Erick became interested in purchasing the property and contacted Charles Hocker, the real estate broker representing Hielscher, from whom he requested information regarding the income and expenses of the business. During his investigation, he also spoke to Hielscher and other persons associated with the business. In January 1993, Hielscher and United Enterprises sold the property and business to Erick for $325,000. After the closing, Erick assigned the property to Erick Racing. A cash payment of $75,000 was made with Hielscher financing the balance of the purchase price. Erick Racing executed a note

2

payable to Hielscher, and Erick individually guaranteed the note. Erick Racing then operated the track for the years 1993 and 1994. However, Erick Racing lost money, and Erick informed Hielscher that the payments on the note could not be made. In response, Hielscher told Erick that interest-only payments could be made for a while. Nevertheless, Erick decided that the information provided to him by Hielscher prior to his purchase of the racetrack had been incorrect, and he filed a lawsuit. Hielscher then foreclosed on the property and continues to own and manage the dragway.

In their first issue, appellants contend that the trial court should not have rescinded the purchase contract and awarded restitution or reliance damages to appellees. In the judgment, the trial court ordered that "all documents related to the Plaintiffs' purchase of Amarillo Dragway, and all Plaintiffs' obligations thereunder, are hereby RESCINDED and CANCELLED in their entirety, and the Court ORDERS that Plaintiffs have no obligations to Defendants whatsoever arising from or related to said documents procured by fraud." Appellants argue that rescission and restitution are improper when the benefits derived from the use of the property are not returned so as to place the parties in a status quo position. Thus, they reason, because the evidence conclusively established that appellees received at least $329,960 in income from operating the Amarillo Dragway and failed to prove that the benefits from the use of the property were returned, appellees have been unjustly enriched. Further, they claim, restitution damages must be offset by any benefits received by the complaining party.

3

Rescission is an equitable remedy, and the measure of damages is generally the return of the consideration paid plus such further special damages as may have been reasonably incurred by the party wronged. *Smith v. National Resort Communities, Inc.,* 585 S.W.2d 655, 660 (Tex. 1979); *Denver City Independent School Dist. v. Moses,* 51 S.W.3d 386, 391 (Tex.App.--Amarillo 2001, no pet.). Damages and rescission are not mutually exclusive remedies when both are needed to give complete relief. *Smith,* 585 S.W.2d at 660. However, rescission is not generally allowed unless the parties are restored to the positions they were in before the contract was made. *Costley v. State Farm Fire and Cas. Co.,* 894 S.W.2d 380, 387 (Tex.App.--Amarillo 1994, writ denied). Thus, the party seeking rescission must return any property received and the value of any benefit derived from its possession. *Reyna v. State Nat. Bank of Iowa Park,* 911 S.W.2d 851, 854 (Tex.App.--Fort Worth 1995, writ denied).

Appellants assert that Plaintiff's Exhibit Nos. 29 and 30, which are statements of revenues and expenses for the years 1993 and 1994, show that Erick Racing took in revenues of approximately $330,000. These documents show income of $149,156.21 for 1993 and $176,804.42 for 1994 before any deductions for expenses. After deducting expenses, Erick Racing suffered a total loss of $105,051.09 for those two years. It is proper to grant rescission without ordering restoration of the status quo or the return of benefits when the business sold has lost money and thus there is no discernable benefit. *See Bonanza Restaurants v. Uncle Pete's, Inc.,* 757 S.W.2d 445, 448 (Tex.App.--Dallas 1988, writ denied).

Appellants advance a similar argument with respect to any damages awarded as reliance damages and benefit of the bargain damages. However, as we have noted, the evidence used by appellants to support their claim of a benefit does not show that a profit was made by appellees. Appellants also claim that, under a benefit of the bargain measure of damages, because the price paid for the real estate and business was $325,000 and the value of the business as shown by appellees' income tax records was $385,314 on January 1, 1994, there are no such damages. Benefit of the bargain damages are measured by the difference between the value as represented and the value received. *Formosa Plastics Corp., USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 49 (Tex. 1998). Lost profits may be recovered on the bargain under this measure of damages if proved with reasonable certainty. *Id.* at 50. However, appellants did not seek to recover any lost profits or benefit of the bargain damages.

Appellants also claim that an improper measure of damages was submitted to the jury because they were not required to reduce any benefits conferred by the amount of the benefits or value received and, since the evidence shows $329,960 in income received, the erroneous instruction allowed them to find amounts not supported by the law or the evidence. We have already found that no benefit was received by appellees, and thus there is no need to address this argument further.

Appellants further contend that the judgment included damages not properly awarded to Erick individually. The charge asked the jury to find the sum of money, if any, that would fairly and reasonably compensate Erick for his damages as a result of fraud for

5

each of the following elements: (1) down payment to acquire the dragway, (2) closing costs, and (3) capital advances to Erick Racing. The jury awarded $50,000 for each of the first and third elements and $6,247.01 for the second element. Nevertheless, appellants claim that the down payment and closing costs were paid by Erick Racing, not Erick individually. In asserting this proposition, they rely upon a closing statement by American Title Company which shows Erick Racing as the purchaser.

The contract of sale between Hielscher and Erick was signed by them on January 12, 1993, and January 11, 1993, respectively. It provided for a cash payment of $75,000 and a real estate lien note of $250,000. That contract of sale was assigned by Erick to Erick Racing on January 15, 1993. Further, Erick testified to the information contained in Plaintiff's Exhibit 32A which showed his individual expenses as $75,000 for down payment, $6,247.01 in closing costs, and $144,000 in lost capital advances. To the extent it can be said that there is a conflict in the evidence as to whether Erick or Erick Racing paid the money that was awarded to Erick, that conflict was for the jury to resolve.

Appellants additionally claim that the recovery of capital advances by Erick is not a restitution element, but a "back-door recovery of a corporate payment cloaked as reliance damages." A corporate shareholder cannot recover damages personally for a wrong done solely to a corporation, even if his earnings are impaired by that wrong. *Wingate v. Hajdik,* 795 S.W.2d 717, 719 (Tex. 1990). Thus, a cause of action for injury to property or impairment of business is vested in the corporation. *Id.* However, this rule does not prevent a shareholder from recovering for wrongs to him individually arising from contract

6

or otherwise. *Id.* Erick testified that he made loans to the corporation from his personal funds to cover operational losses suffered by Erick Racing, which losses were the result of the fraud perpetrated by appellants. Thus, Erick incurred these costs as personal losses resulting from appellants' actions. Further, the corporation was not awarded any damages for these advances which the corporation was unable to repay to Erick, so there is no double recovery.

Appellants further argue that the corporation took capital depreciation and expense deductions on its corporate tax return for these expenditures, and therefore they may not be recovered as individual damages. However, our reading of the evidence is that these tax deductions were taken on items other than those represented by the advanced funds. The corporation recovered $65,559.40 for initial capital improvements and repairs, which were necessary prior to even being able to commence operations. It is on these items that tax deductions were taken. The money Erick recovered individually was for advances he made to the corporation after it was suffering operational losses. At least, appellants have not cited us to any contradicting testimony that establishes the opposite conclusion.

Appellants also assert that the $50,000 awarded for the down payment and the $50,000 awarded for advances to the corporation represent the same element of damages. In making this argument, appellants merely refer us to the closing statement previously mentioned and Plaintiff's Exhibit 32A showing Erick's expenses for which he was seeking recovery. They provide no substantive explanation as to how these documents support their argument. Exhibit 32A shows that Erick paid $75,000 in a down payment and

7

$144,000 in capital advances, which he testified were to cover operational losses. However, the jury failed to award the full amount requested by Erick for either item. The closing statement shows earnest money of $25,000, although the contract of sale entered into with Erick provided for a payment of $75,000 in cash, with the remainder presumably being due at closing. We cannot infer from this information that the amount awarded by the jury for the down payment necessarily included cash advances made by Erick for operational expenses. Thus, we overrule appellants' first issue.

In their second issue, appellants complain of the legal and factual sufficiency of the evidence to support the jury findings with respect to fraud in Question Nos. 1 and 3. In those questions, the jury was asked whether Hielscher and United committed fraud against Erick, which was a proximate cause of damages and against Erick Racing, which was a proximate cause of damages. Appellants argue that the evidence shows Erick relied on his own investigation and not any statements of appellants. Moreover, they assert, the financial documents showing the income for the Amarillo Dragway for 1992 were stamped "Preliminary Draft - For Discussion Purposes Only" because the sale was concluded prior to appellants having finalized their tax returns and Hielscher was having difficulty separating income from the Amarillo Dragway from income from other sources, all of which were included in income for United. Under these circumstances, according to appellants, reliance is not reasonable or expected, and the drafts or estimates do not constitute representations of present or past facts.

In reviewing the legal sufficiency of the evidence, we examine the record for any probative evidence which when viewed in its most favorable light supports the judgment. *Claveria's Estate v. Claveria,* 615 S.W.2d 164, 166 (Tex. 1981). In a factual sufficiency challenge, we examine the entire record to determine if there is some probative evidence to support the finding and, if in light of all the evidence the finding is not manifestly unjust. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965).

The income and expense statements for the Amarillo Dragway for 1992 contain a stamp indicating that they were preliminary drafts. However, Jerry Candy, a certified public accountant who prepared the financial statements based on information provided by Hielscher, testified that his office placed that stamp on the documents, and that it was used when the report was not final and when questions needed to be asked of Hielscher to see if changes or clarifications needed to be made. Candy averred that the stamp was used between him and his client with the implication of that testimony being that it was not placed there by Candy to warn potential buyers that the information might not be accurate.

Hielscher himself testified that he considered those documents to accurately reflect the income for the dragway and he would represent to potential buyers that the figures on those documents reflected the income. While he stated that he did not intend for Erick to rely on those numbers because they were preliminary, he also stated he still believes those numbers are correct. Erick testified that although he saw some documents with the "Preliminary Draft" stamp on them and knew the accountants were working on the books, he had also seen other documents with similar figures that did not have the stamp on

9

them. He attended a track owners' meeting on January 8 -10, 1993, with Hielscher, at which time he asked Hielscher if the information he had been provided was correct and was told that it was. Additionally, under the contract of sale, the buyer was to receive an operating statement showing income and expenses, which were the profit and loss statements already provided to him.

We believe there was evidence from which the jury could conclude that the profit and loss figures on those documents were not merely a statement of opinion regarding the value of the dragway or mere "puffing" or "dealer's talk." They were financial statements prepared by an accountant. It was also reasonable to assume that a potential buyer would be interested in accurate information as to the profitability of the racetrack, and Hielscher stated that he would represent to potential buyers that those figures reflected the income. He also represented just prior to closing that the information was accurate.

Further, Erick relied upon financial statements attached to a brochure prepared for potential buyers which showed gross and net income for 1990 and 1991, although Hielscher represented to him that those figures were too low. He also relied on profit and loss statements for 1988, 1989, 1990 and 1991 provided to him by Charles Hocker, deposit slips representing income for 1991 and 1992, and general ledger sheets. Erick requested to see race reports from the various races held at the track and was told they did not exist, only to find out after his purchase that such reports had existed at one time. There is sufficient evidence to conclude that Erick had a right to rely on the information supplied to him by Hielscher and his agents and that he did rely on them in purchasing the dragway.

10

Appellants also claim a lack of proximate cause with respect to damages based on their arguments that there is no evidence that the assets purchased by appellees are worth less than the purchase price and the "capital advance" made by Erick to Erick Racing and is not an element of damages because there is no evidence that this money has been lost to either Erick or Erick Racing. We have already stated that Erick testified to out-of-pocket expenses incurred as a direct result of the purchase of the race track, which is all he and Erick Racing sought to recover. There is also testimony that the dragway lost money during the two years that it was owned by Erick Racing, which required personal loans by Erick to Erick Racing. This evidence is both legally and factually sufficient to support the jury's verdict. Appellants' second issue is overruled.

In their third issue, appellants argue that the trial court should have awarded them judgment on the amount still owing for the purchase of the dragway under the note and personal guaranty given by Erick. This argument is based on the previous contention that rescission is improper when plaintiffs seek to retain the benefits received under the bargain. It is also based on appellants' assertion that the evidence is legally and factually insufficient to support the jury's findings of fraudulent inducement in Question Nos. 13 and 14. Appellants rely on the same evidence in this issue that they referenced under their second issue. We have already discussed whether rescission is appropriate when there is no benefit to be returned, and we believe the evidence previously specified is both legally and factually sufficient to support the jury's finding of fraudulent inducement.

11

Finally, appellants complain that the court erroneously included nondisclosure as a basis for the fraudulent inducement findings which must necessarily fail and, in light of that failure, does not serve as a defense against their breach of contract claims. The court instructed the jury on both bases of fraud with the instruction on concealment reading as follows:

Fraud occurs when —

a. a party conceals or fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

c. the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

It is appellants' contention that a party is liable for failure to disclose only when that party has a duty to disclose and such a duty only exists when a confidential relationship arises. Because there is no evidence of such a relationship between the parties, they posit, the instruction was erroneous.

A party is not bound by a contract procured by fraud. *Presidio Engineers,* 960 S.W.2d at 46. Fraud may consist either in misrepresentation or passive silence. *Santanna Natural Gas Corp. v. Hamon Operating Co.,* 954 S.W.2d 885, 890 (Tex.App.--Austin 1997, pet. denied). Silence can be equivalent to a false representation if the circumstances

12

impose on a defendant a duty to speak. *Ho v. University of Texas at Arlington,* 984 S.W.2d 672, 691 (Tex.App.--Amarillo 1998, pet. denied). Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship. *Insurance Co. of North America v. Morris,* 981 S.W.2d 667, 674 (Tex. 1998). However, a duty to disclose may also arise when one voluntarily discloses partial information but fails to disclose the whole truth, when one makes a representation and fails to disclose new information which makes the earlier representation misleading or untrue, and when one makes a partial disclosure and conveys a false impression. *Lesikar v. Rappeport,* 33 S.W.3d 282, 299 (Tex.App.--Texarkana 2000, pet. denied); *Bradford v. Vento,* 997 S.W.2d 713, 725 (Tex.App.--Corpus Christi 1999), *aff'd in part and rev'd in part on other grounds,* 48 S.W.3d 749 (Tex. 2001). These obligations can occur even in an arm's length transaction. *See Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 636 (Tex.App.--San Antonio 1993, writ denied).

In the brochure provided to prospective buyers, it was estimated that the Winston NHRA race had an approximate income of $80,000 to $140,000. However, at trial, Hielscher admitted that he had never received $140,000 in income from that race. The figure of $140,000 was actually from a race in Oklahoma, which was probably the highest gross income in recent years on such a race. However, he did not disclose that information in the brochure. He had also told Erick that the figures in the brochure were low. Hielscher further reassured Erick just prior to closing that all of the information he had been given was correct, although he contends now that the financial statements were only

13

preliminary drafts. Thus, there was evidence that Hielscher disclosed only partial information which was not the whole truth and may have been misleading.

Even if the instruction on failure to disclose was error, the error would only be harmful if we could not determine whether the jury based its verdict on an invalid theory. *Crown Life Ins. Co v. Casteel,* 22 S.W.3d 378, 388-89 (Tex. 2000). The jury found in response to Questions 1 and 3 that there was a false representation made as to a past or existing material fact. Therefore, the jury had already determined there was a false representation, and its verdict on that basis supports its answers to Questions 13 and 14. Appellants' third issue is overruled.

We will now address appellees' cross-issues. In their first cross-issue, appellees complain that the trial court erred in granting summary judgment against them on their DTPA claims and breach of contract claims. Appellants filed their summary judgment motion on the basis that appellees could not recover on their DTPA claims, breach of contract claims or any other claims because they agreed in the contract of sale that no representations other than those in the contract were made to them. Further, in the earnest money agreements, Erick stated that he relied solely on his own examination of the assets of the business and not on any statements or representations made by the seller, and he had the right to inspect and did inspect the property.

A movant for summary judgment must establish that there are no genuine issues of material fact. *Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548-49

14

(Tex. 1985). In our review, we take the evidence favorable to the non-movant as true and indulge every reasonable inference in favor of him. To be entitled to summary judgment, a defendant must disprove as a matter of law one of the essential elements of each cause of action or establish one or more defenses as a matter of law. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex. 1995). In this case, the summary judgment order did not specify the grounds upon which it was rendered.

In the contract of sale, Erick acknowledged that appellants had made no "representation or warranty regarding the level of future NHRA affiliation, business prospects or economic conditions relative to the Subject Property or the Amarillo Dragway business which comprise the Subject Property." In the earnest money agreements signed by Erick, he agreed that he "personally examined the equipment, stock on hand and other assets of the business and has relied on his personal examination in making this offer and not upon any statements or representations made by the BROKER, SELLER or their agents in deciding to purchase the property and/or the business." It was also stated that the purchaser "will purchase improvements and real estate as is." In the bill of sale for personal property, Erick agreed that, after the date of the first race in 1993, the personal property was deemed transferred "AS IS, WHERE IS, AND WITH ALL FAULTS" except for a warranty as to title.

Appellees reference *Prudential Ins. v. Jefferson Associates,* 896 S.W.2d 156 (Tex. 1995) as the controlling law on reliance. In that case, there was an agreement to purchase a building "as is," which was freely negotiated by sophisticated parties in an arm's length

15

transaction, which precluded the buyer from proving that he was injured by the seller's actions. *Id.* at 162. However, the court also held that a buyer is not bound by an "as is" clause that he is induced to make by fraudulent representations. *Id.*

Appellees argue both that the provisions in the contracts were boilerplate provisions in pre-printed forms which were not the subject of arm's length transactions and that they were fraudulently induced to enter the contract, thereby rendering any "as is" agreement unenforceable. At the time the motion for summary judgment was filed, appellees had only asserted claims of DTPA violations and breach of warranty and breach of contract claims.[2] However, appellees raised the issue of fraudulent inducement in response to the motion for summary judgment.

Although appellees appear to assert that the contract of sale may not be considered because it was rescinded by the court,[3] the contract of sale had not been rescinded at the time of the trial court's ruling on the motion for summary judgment. Therefore, its provision may not be disregarded on that basis. There was also summary judgment evidence that, even if the provisions were included in a form contract, Erick and appellants were represented by attorneys during the transaction and Erick had conducted his own extensive investigation inspecting the property, examining the books and records,[4] and

[2]Appellees later amended their petition to include claims of fraud and fraudulent inducement.

[3]At the same time, appellees claim the contract of sale was breached.

[4]Appellees contend that the failure of the provision in the earnest money contract to state that Erick examined the books and records renders it ineffective since it is the

16

talking to racers and other personnel. Thus, there is no evidence of unequal bargaining power such as to render the contract to be based on something other than an arm's length transaction.

Appellees' claims of fraudulent inducement in response to the motion for summary judgment are allegedly substantiated by the affidavits of Tracy Hayes, appellees' expert witness, and Erick. An expert's affidavit offered to support or oppose a motion for summary judgment must include proof of the expert's qualifications. *Green v. Brantley*, 11 S.W.3d 259, 264 (Tex.App.--Fort Worth 1999, pet denied); *Arce v. Burrow,* 958 S.W.2d 239, 255 (Tex.App.--Houston [14th Dist.] 1997), *aff'd in part and rev'd in part on other grounds,* 997 S.W.2d 229 (Tex. 1999). No such proof was submitted with the affidavit of Hayes. Therefore, his affidavit, which incorporates his expert report, is not competent to establish fraudulent inducement.

Further, a summary judgment affidavit containing mere conclusions or beliefs is insufficient to raise a genuine issue of material fact. *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex. 1999). In his affidavit, Erick stated that a brochure contained materially false and misleading information, that certain specific representations were false and misleading, that an operating statement was overstated by at least $100,000, and that the Certificate of Seller contained false representations. He also stated that, after operating the track for

accuracy and completeness of those books and records which appellees argue was the gravamen of their complaint under the DTPA. Nevertheless, appellees did not specify that was the gist of their complaint in the petition on file at the time of the summary judgment motion.

17

two years, he found the representations as to dollar volumes, number of racers, number of attendees and the income of the track were materially misrepresented and that historical data had been altered, misrepresented or destroyed. These statements constitute mere conclusions. Erick fails to state the facts from which he draws his conclusions that the statements made and information provided to him were false, misleading, or altered. Therefore, the trial court could have found that the summary judgment evidence provided with respect to fraudulent inducement failed to raise a fact issue on that defense.

Appellants posit that any purported disavowal of reliance in the earnest money contract would not have survived closing. The doctrine of merger generally operates to merge all prior transactions between the parties into the deed. *Alvarado v. Bolton,* 749 S.W.2d 47, 48 (Tex. 1988); *GXG, Inc. v. Texacal Oil & Gas,* 977 S.W.2d 403, 415 (Tex. App.--Corpus Christi 1998, pet. denied). In this instance, appellees claim that the earnest money agreement was merged into the contract of sale. The contract of sale provides that all representations, warranties, and agreements contained in it shall not be deemed to be merged into or waived by any instruments of closing. It also provides that the contract of sale supersedes all prior and contemporaneous agreements and understandings of the parties. However, the bill of sale would not be merged into any document. It has also been held that the doctrine of merger may not be applied to defeat a cause of action under the DTPA for breach of express warranties made in an earnest money agreement and breached in a deed. *Bolton,* 749 S.W.2d at 48. Conversely, when the purchaser knowingly negates any causation with respect to his DTPA claims in the earnest money

18

agreement by agreeing to purchase "as is," we do not believe that he may retract that negation by the doctrine of merger when the provisions of the contract of sale do not contradict his right to inspect the property and rely on his own investigation in making the purchase.

In the contract of sale, Erick acknowledges that the seller has made no representation or warranty regarding the level of future NHRA affiliation, business prospects, or economic conditions relative to the dragway business. Appellees argue that it is clear that this statement relates only to future events, not the warranties and representations about historical economic data and that, even if it does relate to past economic data, it conflicts with other express warranties in the contract making it necessary to construe it against the drafter of the contract or rendering it ambiguous. If we accept appellees' argument that the acknowledgment in the contract of sale relates only to future business, then there is no conflict between that representation and the earnest money agreement. Further, the contract of sale is not ambiguous. There is also uncontradicted summary judgment evidence that the earnest money agreement and contract of sale were negotiated by both parties and, as we have already noted, both sides were represented by counsel.

Appellees argue that appellants breached paragraphs 4.1(g) (obligation to provide an operating statement); 6.1(a) (warranty of fee simple title); 6.2(a) (right of full access to the books and records of the business and the right to physically inspect the property); 8.1(a) (a statement that all representations and warranties are true); 8.1(c) (statement of

19

compliance with all covenants of the contract); and a certificate that the operating statement provided is accurate, complete, and current as of the date provided. While they assert that the summary judgment evidence "supports such allegations," appellees fail to provide cites in the record to the summary judgment evidence which they contend provides that support. It is appellees' burden with respect to their cross-issue to direct this court to portions of the record which they contend support their complaints, and we are not required to search a voluminous record for the summary judgment evidence and then speculate as to which parts of that evidence may support appellees' arguments. *See Granada Biosciences, Inc. v. Barrett,* 958 S.W.2d 215, 222 (Tex.App.--Amarillo 1997, pet. denied).

Even so, we have examined the summary judgment evidence and we do not agree that it shows that appellants failed to provide the operating statement, failed to warrant fee simple title, failed to give access to the books and records of the business, failed to allow a physical inspection, failed to give a statement that all representations were true or failed to give a certificate with respect to the operating statement. Erick states in his affidavit that he was never provided the following books and records, but was assured that they would support the summary of expenses and income provided to him: (1) race logs for 1990, 1991, and 1992, (2) complete deposit information on all checking accounts for United, and (3) race summaries for 1990, 1991, and 1992. However, there is no evidence in the affidavit that this failure damaged appellees in some way. While Erick concludes in his affidavit that the information he was provided was false or misrepresented, he does not state that if he had been provided the specific items listed above, he would have known

20

prior to his purchase that the financial information he received was false. The most his expert witness can say is that reviewing actual deposit slips for six deposits for which he did receive the date and amount "could help" determine the source of the deposits. However, this statement is speculative and, even without that information, the expert was able to render an opinion that the financial statements were not accurate. Thus, the summary judgment evidence does not raise a fact issue on appellees' breach of contract claims.

Appellees finally argue that because the subject provisions do not approach the specificity of the language in *Prudential,* they do not constitute a disavowal of reliance. However, the *Prudential* court noted that it was not necessary in every "as is" provision to go into as much detail as was present in that case. *Prudential*, 896 S.W.2d at 161. Accordingly, based on the record before us, there was no error in the court granting summary judgment on the claims before it. Appellees' first cross-issue is overruled.

In their second cross-issue, appellees claim the trial court erred in excluding evidence of appellants' agents giving instructions that Erick was not to be told about certain material facts prior to his purchase. John Willems, the transaction attorney hired by appellants, faxed a letter to Charles Hocker, appellants' real estate agent, from the attorney for Gregory and Tina Farinsky, who at one time had been interested in purchasing the dragway. In that letter, there were allegations that appellants had not made an accurate disclosure of the financial condition of the business. That letter was Plaintiff's

21

Exhibit 54. The same letter, Plaintiff's Exhibit 55, was also faxed by Willems to Chicago Title, in which there was an instruction on the cover sheet as follows:

> Attached are the letters from counsel for the Farinskys' [sic] about which you and I have spoken. These letters are tenderred [sic] to you "IN TRUST" with the express understanding that they will be used by you and the underwriter for the sole purpose of making the decision whether or not to delete numberred [sic] paragraph 7 on Schedule "C" of the title commitment for the referenced [sic] transaction. These letters are not to be shown, deliverred [sic] or discussed with the Jack Eric [sic], his counsel or other representatives without written authority from my client or me.

Appellees argue that this document constitutes an admission of a party opponent pursuant to Rule of Evidence 801(e)(2) or a prior inconsistent statement. Further, they posit, it is admissible to impeach representations that the claims of the Farinskys related only to recovery of earnest money pursuant to Rule of Evidence 613(a). This error was not harmless, they assert, because the jury only awarded $1.00 in punitive damages against each defendant, but it is likely more substantial punitive damages would have been awarded if this evidence had been before them.

Appellees have not provided us with a cite in the record where they sought to admit Plaintiff's Exhibits 54 and 55 and where the court denied the admission of those exhibits. They have cited us to a motion in limine in the clerk's record and to Volume 4, Page 285 of the reporter's record as the locations where the court excluded the letters; however, we have been unable to find any actual ruling on admissibility by the court at either location. In Volume 5, Page 285, at the conclusion of a bill of exception, the trial court states: "All

right. I made a ruling. I'll stick with it." That bill of exception was apparently made with respect to Plaintiff's Exhibits 54, 55, 63, and 64. The latter two exhibits are a petition and counterclaim filed in a lawsuit by the Farinskys against Hielscher. We have located a cite in the record where appellees attempted to have Exhibit 63 admitted which, after objection, the court denied. Nevertheless, we have not located where the court initially denied the admission of Exhibits 54 and 55, and we are not required to read the entire record in an attempt to find it. Without this reference, we cannot determine if appellees sought the admission of those exhibits on the same basis which they now present to this court. To preserve a complaint on appeal, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling sought from the trial court with sufficient specificity to make the court aware of the complaint. Tex. R. App. P. 33.1(a)(1)(A). Thus, appellees have waived this complaint.

Appellees complain in their third cross-issue of the trial court's failure to grant a judgment notwithstanding the verdict with respect to Question Nos. 2(a) and 4(a) on the amount of damages sustained by appellees. Question No. 2(a) asked the jury what sum of money would fairly and reasonably compensate Erick for his damages for the down payment to acquire the Amarillo Dragway. The jury responded with $50,000. Question No. 4(a) asked the jury what sum of money would fairly and reasonably compensate Erick Racing for damages for monthly note payments on the purchase of the Amarillo Dragway. The jury responded with $15,000. Appellees contend there was uncontradicted testimony that the answer to the first question was $75,000 and the answer to the second question

23

was $51,430.02 and, because the jury was not free to disregard the only evidence presented, we should disregard the jury's findings and rule in appellees' favor for the amounts presented by them. We interpret this issue as a challenge to the sufficiency of the evidence to support the verdict.

If damages can be estimated with reasonable certainty, the amount is left for determination by the trier of fact. *Bildon Farms, Inc. v. Ward County Water Imp. Dist. No. 2,* 415 S.W.2d 890, 897 (Tex. 1967). Generally, the factfinder has discretion to award damages within the range of evidence presented. *Price Pfister, Inc. v. Moore & Kimmey, Inc.,* 48 S.W.3d 341, 352 (Tex.App.--Houston [14th Dist.] 1999, pet. denied). However, the factfinder may not assess an amount neither authorized nor supported by evidence, and there must be a rational basis for the calculation. *First State Bank v. Keilman,* 851 S.W.2d 914, 930 (Tex.App.--Austin 1993, writ denied).

In *Keilman*, the jury found that First State Bank had charged $360 in unauthorized interest in a demand letter. *Id.* at 929. The Keilmans presented evidence at trial that $7,161.44 was the amount of excess interest charged, while First State Bank presented evidence that $169.92 was demanded in interest. Neither party could explain how the jury arrived at its result. The court determined that the jury's finding was inexplicable in light of the evidence at trial, and that no rational basis existed for the jury's calculation except that it fell between the Keilmans' figure and First State Bank's figure. *Id.* at 931.

In this instance, there was testimony by Erick that he had made a $75,000 down payment. The contract of sale between Erick and appellants also called for a cash payment of $75,000, with $25,000 to be paid as earnest money and the remainder due at closing. The only evidence that indicates that any portion of this sum was paid by Erick Racing is a closing statement prepared by the title company showing the purchaser as Erick Racing and a down payment of earnest money in the amount of $25,000. As we have noted, it was within the province of the jury to resolve any conflict as to whether the down payment was paid by Erick or Erick Racing. Thus, there is some evidence to support the award of $50,000 to Erick as a down payment.

With regard to that portion of appellees' third cross-issue challenging the jury's $15,000 answer to Question No. 4a relating to the amount of damages awarded because of monthly note payments, appellees correctly recognize that we cannot arbitrarily increase a jury finding, but it would be necessary that we find the evidence contrary to the jury finding conclusively establishing another amount. This we cannot do. The evidence in this case was tortuous and conflicting, and we cannot say that it was sufficient to establish conclusively a figure different from that awarded by the jury. Appellees' third cross-issue is overruled.

In their fourth and final cross-issue, appellees argue that the trial court erred in not granting a judgment notwithstanding the verdict with respect to the jury's zero answer to Jury Question Nos. 9(b), 9(c), and 9(d) relating to the amount of attorney's fees to be

25

awarded on appeal. In that regard, the jury awarded a fee of $135,000 for services rendered in the trial and preparation for trial.

Appellees argue that the jury should have awarded $15,000 for an appeal to the Court of Appeals, $2,000 for making or responding to an application for writ of error, and $2,000 if a writ of error was granted. In supporting that argument, appellees rely on their expert witness, who testified to those amounts. They also point out that portion of the testimony of appellants' expert witness in which he opined that his estimate of $10,000 in event of an appeal to the Court of Appeals was probably too low. Thus, they contend, while the jury was free to disbelieve an expert witness, it may not fail to award such fees in the face of "clear, direct, positive, and uncontradicted evidence on an issue requiring expert testimony."

The award of attorney's fees is a question of fact, and the jury's decision to award less than requested will generally not be disturbed. *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997). Further, an expert's opinion is not conclusive, and the factfinder is not bound by such testimony, but may also consider the complexity of the case, the amount in controversy, the time and effort spent, and the expertise required. *Mattniessen v. Schaefer*, 897 S.W.2d 825, 827 (Tex.App.--San Antonio 1994), *rev'd on other grounds*, 915 S.W.2d 479 (Tex. 1995). Generally, the testimony of an interested witness, although uncontradicted, does no more than raise a fact issue for determination by the jury. *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990).

26

An exception to this rule arises when the testimony is not contradicted by any other witnesses or attendant circumstances, and it is clear, direct and positive and free from contradiction, inaccuracies, and circumstances tending to cast any suspicion on it. *Id.*

David Russell, a practicing attorney in the Amarillo area, testified on behalf of appellees that he had reviewed the pleadings and the file and he was familiar with the usual and customary fees for this type of litigation. In his opinion, a reasonable fee for an appeal to the Court of Appeals would be $15,000, $2,000 for making or responding to a writ of error to the Supreme Court, and $2,000 if the petition for writ of error is granted. He also testified that payment for the case was based upon a contingency fee and that 35% of a recovery was very close to the actual time and money expended by the lawyers in the case. No cross-examination was conducted that contradicted the fees which he testified would be reasonable in the event of an appeal.

The attorney representing appellants testified that if an appeal is filed, a reasonable attorney's fee would be $10,000, $5,000 for making or responding to a petition for writ of error and $10,000 for legal services if the petition was granted. As we have noted, he also averred that $10,000 for an appeal to the Court of Appeals was probably low and that Russell's testimony as to fees if a petition for writ of error was granted was too low.

In *Jackson Law Office, P.C. v. Chappell,* 37 S.W.3d 15 (Tex.App.--Tyler 2000, pet. denied), the jury failed to award any attorney's fees in a breach of contract action in spite of testimony that a reasonable fee would be one-third of the damages recovered. The

court held that an award of attorney's fees on a valid contract claim was mandatory under Texas law, and the only question for the jury was the reasonable value of those services. *Id.* at 23. Thus, if evidence of attorney's fees is offered, a finding that the attorney's services had no monetary value is factually insufficient. *Id.* Similarly, in *Jess v. Libson*, 742 S.W.2d 90 (Tex.App.--Austin 1987, no writ), an award of $1 in attorney's fees by the jury in an action for damages with respect to a representation that allegedly induced the closing of a real estate transaction was found to be against the great weight and preponderance of the evidence when there was testimony as to a reasonable attorney's fees both through trial and on appeal. *Id*. at 92.

However, in *Cain v. Pruett*, 938 S.W.2d 152 (Tex.App.--Dallas 1996, no writ), the court had occasion to consider a case akin to this one in which the attorneys were working on a contingency fee. In that case, the court opined that because of the contingency fee, the amount of appellate attorney's fees was not conclusively established because the jury could reason that an appeal of the case would be a part of the services for which the attorneys agreed to accept a percentage of the final judgment. *Id.* at 160. Likewise, that reasoning is applicable to this case. Appellees' fourth cross-issue is overruled.

In summary, we have overruled all of appellants' issues and appellees' cross-issues. The judgment of the trial court is affirmed.

<br>

|  |  |
|---|---|
| | John T. Boyd |
| Do not publish. | Senior Justice |